#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
#### NORTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **PLAINTIFF** |
| **ARIENNE JONES, DERIC JONES, HERSCHEL WILLIAMS, and TANSHENETTA VEALS** | **PLAINTIFF-INTERVENORS** |
| V. | CAUSE NO. 3:20-CV-00729-CWR-LGI |
| **SSM PROPERTIES, LLC, STEVEN MAULDING, SR., JAMES ROE, and SHEILA MAULDING** | **DEFENDANTS** |

## ORDER

Before the Court is defendants' Stephen Maulding, Sr. (captioned incorrectly as Steven Maulding, Sr.), Sheila Maulding, and SSM Properties, LLC's motion for summary judgment. Docket No. 73. On review, the motion will be denied.

**I.    Factual and Procedural History**

Defendants Stephen Maulding, Sr. and Sheila Maulding own SSM Properties, LLC, which operates Oak Manor Apartments, Pearl Manor Apartments, and 468 Place Townhomes. The government alleges that the Mauldings, operating through their co-defendant James Roe, violated the Fair Housing Act (FHA). Plaintiff-intervenors Arienne Jones, Deric Jones, Herschel Williams, and Tanshenetta Veals, are all Black testers for the Louisiana Fair Housing Action Center (LaFHAC), and "aggrieved persons" as defined by the FHA.

The following allegations are drawn from the government and plaintiff-intervenors' complaints and the parties' summary judgment briefing.

In 2016 and 2017, LaFHAC conducted a series of fair housing tests in and around Jackson, Mississippi, to investigate and uncover race discrimination in rental housing. Docket No. 76 at 3.

Fair housing tests are "an investigative tool commonly used by fair housing organizations to determine if landlords and others offering housing are discriminating or engaging in differential treatment." *Greater New Orleans Fair Hous. Action Ctr., Inc. v. Hotard*, 275 F. Supp. 3d 776, 779 (E.D. La. 2017). "Testers" are "individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982).

LaFLAC conducted four paired tests at Oak Manor Apartments in Pearl, Mississippi. Docket No. 76 at 3. Each test involved two testers, one White and one Black. *Id.* Two pairs were male and two were female. *Id.* Each pair was assigned comparable professional profiles and income and directed to call and visit Oak Manor, using a phone number listed in the local newspaper, the Clarion-Ledger. *Id.* at 3-4. Each tester audio-recorded the entirety of their test, including phone calls and visits. *Id.* at 4.

According to the government, the tests "revealed an extensive pattern of race discrimination and steering" at the Mauldings' properties. *Id.* at 4. As support, the government cites a number of transcripts of tests and site visits, amongst other evidence. At the very least, the transcripts reveal several disturbing statements from defendant Roe to the various testers.

For example, Tanshenetta Robiskie (captioned as Tanshenetta Veals) is a Black tester. She called the business line for SSM Properties in November 2017 and Roe answered. Docket No. 76-10 at 1. On the call, Roe informed Robiskie that a unit at 468 Place Townhomes was available. *Id.* at 4, 6. Yet, upon meeting her, he stated "[y]ou're not what I expected" and "I don't even know why you're here, ma'am, to be honest with you." Docket No. 76-13 at 3. He then told her that no units were available, or viewable, despite telling her otherwise earlier that day. *Id.* at 11, 27. When an unidentified individual in the housing office mentioned Pearl Manor Apartments, Roe said to

2

the Black tester, "I can't put you at Pearl Manor. Them old men will have a heart attack. They'll be thinking I done let the zoo out again." *Id.* at 7. Later that day, Roe showed a vacant unit at 468 Place Townhomes to a White tester, and by contrast, stated that the "men" at Pearl Manor "would love you to death" and that she would "fit in good over there with the other girls." Docket No. 76-14 at 26. Roe added that "I have to be careful who I put in here [Pearl Manor]" because if "some of these people . . . ever move because of somebody, my boss would fire me." *Id.* at 45.

In October 2018, the United States Department of Housing and Urban Development (HUD) notified the Mauldings of formal complaints of discriminatory housing practices and started its own investigations into the complaints. Docket No. 74 at 6. During those investigations, Roe swore that,

> . . . When I was on the property doing maintenance, I tried to help Mr. Maulding and overstepped my authority without his knowledge or direction. I never meant to cause him any problem with my joking with prospective tenants. I see [now] my jokes were not funny to some if I actually said what is reported. I told some tenants looking for apartments I was the manager/owner just trying to act a big shot., knowing they would find out different if they leased the apartment.

Docket No. 73-10, Affidavit from James Roe to HUD.

Incredibly, HUD ultimately found that "no reasonable cause exists to believe that a discriminatory housing practice has occurred" and dismissed the complaints. Docket No. 74 at 7-8; *see also, e.g.*, Docket No. 73-12. Notwithstanding HUD's dismissal, the complainants were permitted to commence a civil action in federal district court. *See* 42 U.S.C. § 3613(a).

This action followed.

In the present motion, defendants argue that this action is time-barred and that the Mauldings are not liable for the actions of Roe.

## II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking to avoid summary judgment must identify admissible evidence in the record showing a fact dispute. *Id.* at 56(c)(1). "Once a summary judgment motion is made and properly supported, the nonmovant must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. Neither 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the nonmovant's burden." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (quotation marks and citations omitted).

The Court views the evidence and draws reasonable inferences in the light most favorable to the nonmovant. *Maddox v. Townsend and Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011). But the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of reh'g*, 70 F.3d 26 (5th Cir. 1995).

## III. Discussion

### A. This Action Is Not Barred by Any Statutes of Limitation

Defendants argue that this action is time-barred. Not so. Defendants incorrectly cite 42 U.S.C. § 3613(a)(1)(A), which sets forth a two-year statute of limitation for any civil action brought by an "aggrieved person". But this action was brought by the United States, which is not an "aggrieved person" within the meaning of the statute. Suits brought by the government, such as here, are brought under 42 U.S.C. §§ 3612(o) and 3614(a).

Section 3614(a) authorizes the Attorney General to commence a civil action where there is a "pattern or practice of resistance to" the FHA or where "any group of persons has been denied

4

any of the rights." This section does not set a statute of limitations for claims for injunctive relief. Accordingly, courts have generally held that these claims are not subject to any time limit. *See Garcia v. Brockway*, 526 F.3d 456, 460 (9th Cir. 2008). When seeking money damages under this section, actions are subject to the general three-year statute of limitations set forth in 28 U.S.C. § 2415(b). Though, "all periods during which . . . facts material to the right of action are not known and reasonably could not be known" by the Attorney General, are excluded. 28 U.S.C. § 2416(c).

Here, the government contends that the Attorney General learned of the material facts to this claim shortly after October 2020. This action was filed in November 2020, and thus, is well within the three-year statute of limitations. This point is not in contention by the parties. Nor is the timeliness for civil penalties in dispute, whereby the government is subject to a five-year limitations period. 28 U.S.C. § 2462.

Section 3612(o), meanwhile, limits commencement of an action by the Attorney General to no later than 30 days after the filing of an "election" with HUD under 42 U.S.C. § 3612(a). In turn, § 3612(a) states that when HUD files a charge of discrimination, any party to an FHA complaint may commence a civil action in federal court in lieu of an HUD administrative law proceeding.

Here, the government and plaintiff-intervenors filed their Notice of Election of Civil Action on October 14, 2020, and commenced this action on November 12, 2020, or 29 days later. Thus, under 3612(o), this action is timely.

### B.     Whether a Principal-Agent Relationship or Apparent Authority Exists Is a Question for the Jury

Once Title VIII of the Civil Rights Act of 1968, the FHA prohibits discrimination in housing on the basis of race, color, religion, sex (including gender identity and sexual orientation), familial status, and national origin. The Fair Housing Amendments Act of 1988 amended the FHA

to bar housing discrimination based on disability as well. The Supreme Court has held that actions brought for housing discrimination, in effect, are actions in tort. *See Meyer v. Holley*, 537 U.S. 280, 285 (2003). "[T]he duty of a property owner not to discriminate in the leasing or sale of that property is non-delegable." *Walker v. Crigler*, 976 F.2d 900, 904 (4th Cir. 1992). And in accordance with general principles of tort law, "it is well established that the [FHA] provides for vicarious liability." *Meyer*, 537 U.S. at 285.

"[T]raditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Id.* The test is whether the principal has "the right to direct or control" the agent and whether there is "the manifestation of consent by one person to another that the other shall act on his behalf" as well as "consent by the other to so act." *Id.* at 286 (emphasis in original) (quoting Restatement (Second) of Agency § 1). If a relationship is established, "[t]he principal is liable for the acts and negligence of the agent in the course of his employment, although he did not authorize or did not know of the acts complained of[.]" *Id.*; *see also Marr v. Rife*, 503 F.2d 735, 741 (6th Cir. 1974) ("The discriminatory conduct of an apartment manager or rental agent is, as a general rule, attributable to the owner and property manager of the apartment complex, both under the doctrine of *respondeat superior* and because the duty to obey the law is non-delegable."); *see also* 24 C.F.R. § 100.7(b) ("A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law.").

The Mauldings claim that Roe was neither employed by SSM Properties nor received a salary. Docket No. 74 at 3. To further distance themselves from Roe, they claim that Roe was given "very limited maintenance tasks"; minimal payment; and "no authority (executive or apparent)

6

over operations, management, or decisions of any of the subject rental properties." *Id.* at 2-3. Instead, they claim, all responsibility fell to the Mauldings, alone. *Id.* at. 3. They were responsible for "renting, processing, evaluating, and approving all applicants." *Id.* Further, they contend that many of Roe's actions were unauthorized. This includes Roe holding himself out as the "manager"; answering telephone calls from prospective tenants on the business line; evaluating prospective tenants' "qualifications"; and showing properties to prospective tenants. Finally, they state that they only learned of alleged discriminatory practices when they received correspondence from HUD in October 2018 regarding the formal complaints and ensuing investigations. *Id.* at 6.

But the Mauldings fail to argue the test—that they lacked "the right to direct or control Roe." *See Meyer*, 537 U.S. at 286. The test is *not* whether the principal regards or designates the agent as an employee. *See Northside Realty Assocs., Inc. v. United States*, 605 F.2d 1348, 1353-54 (5th Cir. 1979) (holding that agents' status as "independent contractors" did not defeat principal's liability). And whether the agent is compensated is not determinative. *Harris v. Itzhaki*, 183 F.3d 1043, 1054 (9th Cir. 1999) (holding jury could reasonably find principal-agent relationship under FHA even though defendants did not compensate or offer rental discount to purported agent.). Hence, these facts do not demonstrate that the Mauldings are entitled to judgment as a matter of law.

An additional problem for the Mauldings is that there are a number of admissions that suggests that Roe was indeed their agent. For example, the Mauldings admit that they gave Roe "limited authority to give prospective tenants rental applications upon request"; "a master key for the apartments"; and allowed Roe to "keep office space" at Oak Manor. *Id.* at 3. During the housing tests, Roe and the Mauldings routinely referred to Roe as their property manager. *See, e.g.*, Docket No. 76-21 at 4.

7

Indeed, the government cites to several occasions where the Mauldings did direct Roe's behavior. *See, e.g.*, Docket No. 76-12, James Roe Dep. at 7 ("[I]t was their business. I just came and go as they asked me to."); 76-24, SSM Props. 30(b)(6) Dep. at 123 ("I would not let James do a maintenance call in an occupied apartment unless I had talked to the tenant . . . .").

Furthermore, the government cites to ample evidence that casts doubt on the Mauldings' characterization of their relationship with Roe. For example, the Mauldings purportedly authorized Roe to appear on their behalf in Rankin County Justice Court. For support, the government cites to the declaration of the former Justice Court Judge, John Shirley. Docket No. 76-32. In his declaration, Shirley states that Steven Maulding represented to him that Roe was a part owner of SSM Properties and accordingly, must be permitted to represent the Mauldings and SSM Properties in eviction proceedings. *Id.*

Alternatively, the government argues, at the very least, Roe acted with "apparent authority." Apparent authority does not require an agency relationship. *See* Restatement (Third) of Agency § 2.03. The doctrine "applies to actors who appear to be agents but are not, as well as to agents who act beyond the scope of their actual authority." *Id.* at comment a. For support, the government cites to *Avakina v. Chandler Apartments, LLC*, wherein apparent authority is defined as authority "created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." No. 6:13-CV-1776-MC, 2015 WL 413813, at *7 (D. Or. Jan. 30, 2015) (quoting Restatement (Third) of Agency § 3.03).

Though not binding, *Avakina* is instructive. In it, a tenant agreed to "keep an eye on things and answer the business phone" for the owner in exchange for a break in rent. *Id.* at *1. The tenant was neither an employee nor manager, and the owner "retained sole authority to accept or deny

8

[prospective tenant] applications." *Id*. Still, the owner was held liable for the tenant informing two testers that the building did not accept service dogs, in violation of the FHA's prohibition on disability discrimination. *Id.* at *2, 7-8. In granting summary judgment for the plaintiff, the court held that the tenant had apparent authority to make discriminatory statements to the testers, a finding that "depends on the point of view of a reasonable third party." *Id.* at *7.

The reasoning in *Avakina*, the government contends, is applicable here. It is undisputed that the Mauldings referred to Roe as their property manager, provided Roe with the master key to all their properties, gave him office space at SSM Properties, allowed Roe to hand out rental applications, and let him show properties. A reasonable jury could find that the Mauldings placed Roe in "a position to commit violations of the FHA[.]" *Id.* at *8. To this, the Mauldings have offered no reply.

Finally, a jury has the right to assess the credibility of the witnesses. Apparently, unlike HUD, persons from this community sitting in the jury box may reject Roe's contention that he did a lot of stuff behind the Mauldings' backs. *See* Docket No. 74 at 5. Moreover, the jury may also reject Roe's explanation that he was merely joking with prospective tenants and that he was merely "trying to be a big shot." *Id*. at 7. The joke may indeed be on him, and the jury may arrive at the conclusion that he apparently has now realized: his "*jokes* were not funny." *Id*.

This Court finds that the Mauldings have failed to demonstrate that they are entitled to judgment as a matter of law. Accordingly, their motion is denied.

IV. **Conclusion**

The motion for summary judgment is denied.

**SO ORDERED**, this the 12th day of April, 2022.

s/ Carlton W. Reeves<br>UNITED STATES DISTRICT JUDGE

9