**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **PLAINTIFF** |
| **ARIENNE JONES, DERIC JONES, HERSCHEL WILLIAMS, and TANSHENETTA VEALS** | **PLAINTIFF-INTERVENORS** |
| **V.** | **CAUSE NO. 3:20-CV-729-CWR-LGI** |
| **SSM PROPERTIES, LLC, STEVEN MAULDING, SR., JAMES ROE, and SHEILA MAULDING** | **DEFENDANTS** |

# ORDER

Before the Court are the United States and plaintiff-intervenors' motions for summary judgment against defendants Stephen Maulding, Sr. (captioned incorrectly as Steven Maulding, Sr.), Sheila Maulding, SSM Properties, LLC (collectively referred to as the "Mauldings"), and James Roe. Docket Nos. 112 and 114. The Mauldings and SSM Properties, LLC oppose summary judgment. James Roe has failed to respond. Upon review, the motions will be GRANTED.

## I. Factual and Procedural History

Stephen and Sheila Maulding own SSM Properties, LLC, which operates Oak Manor Apartments, Pearl Manor Apartments, and 468 Place Townhomes in and around Jackson, Mississippi. The government alleges that the Mauldings, operating through their co-defendant James Roe, violated the Fair Housing Act (FHA). Plaintiff-intervenors Arienne Jones, Deric Jones, Herschel Williams, and Tanshenetta Veals, are all Black testers for the Louisiana Fair Housing Action Center (LaFHAC), and "aggrieved persons" as defined by the FHA.

On February 17, 2022, the Mauldings and SSM Properties, LLC, filed a motion for summary judgment. This Court denied that motion on April 12. Docket No. 95. On May 18, the United States and plaintiff-intervenors filed the present motions for summary judgment.

The following allegations are drawn from the summary judgment briefing and supporting materials.

In 2016 and 2017, LaFHAC conducted a series of fair housing tests in and around Jackson, Mississippi, to investigate and uncover race discrimination in rental housing. Docket No. 113 at 3. Fair housing tests are "an investigative tool commonly used by fair housing organizations to determine if landlords and others offering housing are discriminating or engaging in differential treatment." *Greater New Orleans Fair Hous. Action Ctr., Inc. v. Hotard*, 275 F. Supp. 3d 776, 779 (E.D. La. 2017). "Testers" are "individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982).

LaFHAC conducted four paired tests at Oak Manor Apartments in Pearl, Mississippi. Docket No. 113 at 3. Each test involved two testers, one white and one Black. *Id.* Two pairs were male and two were female. *Id.* Each pair was assigned comparable professional profiles and income and directed to call and visit Oak Manor, using a phone number listed in the local newspaper, the Clarion-Ledger. *Id.* at 3-4. Each tester audio-recorded the entirety of their test, including phone calls and visits. *Id.* at 4.

According to the government, the tests "revealed an extensive pattern of race discrimination and steering" at the Mauldings' properties. *Id.* at 4. As support, the government cites a number of test transcripts, amongst other evidence.

The transcripts reveal several disturbing statements from defendant Roe to the various testers. For example, Tanshenetta Robiskie (captioned as Tanshenetta Veals) is a Black tester. She called the business line for SSM Properties in November 2017; Roe answered. Docket No. 113 at 4. On the call, Roe informed Robiskie that a unit at 468 Place Townhomes was available. *Id*. Yet, upon meeting her, he stated "[y]ou're not what I expected" and "I don't even know why you're here, ma'am, to be honest with you." Docket No. 112-1 at 3. He then told her that no units were available, or viewable, despite telling her otherwise earlier that day. *Id.* at 11, 28. He added, "[d]on't sneak in the back door out there, you get in trouble." *Id.* at 7. When an unidentified individual in the housing office mentioned Pearl Manor Apartments, Roe said to the Black tester, "I can't put you at Pearl Manor. Them old men will have a heart attack. *They'll be thinking I done let the zoo out again.*"[1] *Id.* at 8 (emphasis added). Later that day, Roe showed the unit at 468 Place Townhomes to Kaitlin Marone, a white tester, and by contrast, stated that the "men" at Pearl Manor "would love you to death" and that she would "fit in good over there with the other girls." Docket No. 112-12 at 26. Roe added that "I have to be careful who I put in here [Pearl Manor]" because if "some of these people . . . ever move because of somebody, my boss would fire me." *Id.* at 45.

Roe was indeed *very* careful. He made a point to show zero Black testers units at 468 Place Townhomes or Pearl Manor. If they were showed any units at all, it was Oak Manor. White testers, however, were invited to apply and/or shown units at 468 Place Townhomes and Pearl Manor. Roe

---

[1] It cannot be overstated that this is Roe's characterization of the Black potential tenants. It is he who equates them to zoo animals. Out of his own mouth degrading and dehumanizing race-based animus. *See Henry v. CorpCar Serv. Houston, Ltd.*, 625 F. App'x 607, 612 (5th Cir. 2015) ("[C]ourts have repeatedly found that intentionally comparing African-Americans to apes is highly offensive such that it contributes to a hostile work environment."); *Green v. Franklin Nat'l Bank*, 459 F. 3d 903, 911 (8th Cir. 2006) ("To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the mere unflattering, it is degrading and humiliating in the extreme.") (citation omitted); *Quintero v. Angels of the World, Inc.*, No. 19-CV-6126 (DG), 2021 WL 4464123, at *6 (E.D.N.Y. Sept. 10, 2021) (plaintiffs who alleged they were "regularly called 'Monkeys' and 'Zoo Animals' from the Bronx Zoo'" stated race-based employment discrimination claim).

noted that the white testers would be "happy" and "fit in" there, yet Roe explicitly discouraged white testers from moving into Oak Manor, saying:

> I don't want to put you here. . . . I mean, it ain't that I don't want to. How can I put it? . . . If I put somebody in there that doesn't fit in and you don't get along with your neighbor, you're going to move on . . . .

*Id.* at 15. He added that the Oak Manor residents would "take advantage" of the white testers. Docket No. 112-17 at 17.

Roe refused to show Black testers units until their applications had been approved. Roe also interrogated Black testers on their finances, requiring Arienne Jones to provide a copy of her employment contract, adding that it must reflect at least a one-year commitment. Roe had Herschel Williams, another Black tester, catalog and explain all his bills, including a $10 monthly charge to PlayStation online. Docket No. 112-16 at 20-21. Roe added, "I can't even rent you a property if you ain't got a job. The owner ain't going to let me." *Id.* at 6. Yet, to Brad Hellman, a white tester, Roe said, "[t]he only thing that's going to hurt you me [sic] trying to get you in here, is you not having a job. But that's never stopped me." Docket No. 112-17 at 28. Roe also offered to hold an apartment for Kaitlin Marone, the white tester, despite her having no proof of income, student loan debt, and her stating that she has "one credit card" that has been "maxed out for years." Docket No. 112-12 at 6, 63-64. Roe further showed white testers units even though their applications had not yet been approved.

Roe turned away Deric Jones, a Black tester, instantly. How instant? Apparently, after seeing Jones arrive, he left Jones standing outside of the office door. Roe got Jones' attention by speaking from the upstairs balcony, informing Jones that there weren't any vacant units, and turning him away. *See* Docket No 112-20 at 2-4 and 8. The following day, Roe informed William Robinson, a white tester, of two properties that were to become vacant within the month. When

Robinson approached the office, it was locked, so he called the office number. Roe answered and explained that he was indeed taking applications, but he was just around the corner from the office and would meet him there to take his application. Docket No. 112-21 at 3-4. In less than two minutes, Roe welcomed Robinson in the office to discuss with him his housing needs. *Id*. at. 2-3. The contrast between the treatment of Jones and Robison could not be more obvious.

In October 2018, the United States Department of Housing and Urban Development (HUD) notified the Mauldings of formal complaints of discriminatory housing practices and started its own investigations into the complaints. Docket No. 121 at 6. During those investigations, Roe swore that,

> When I was on the property doing maintenance, I tried to help Mr. Maulding and overstepped my authority without his knowledge or direction. I never meant to cause him any problem with my joking with prospective tenants. I see [now] my jokes were not funny to some if I actually said what is reported. I told some tenants looking for apartments I was the manager/owner just trying to act a big shot., knowing they would find out different if they leased the apartment.

Docket No. 120-10.

Incredibly, HUD ultimately found that "no reasonable cause exists to believe that a discriminatory housing practice has occurred" and dismissed the complaints. Docket No. 74 at 7-8; *see also, e.g*., Docket No. 120-12. Notwithstanding HUD's dismissal, the complainants were permitted to commence a civil action in federal district court. *See* 42 U.S.C. § 3613(a).

This action followed.

Plaintiffs move for summary judgment under the Fair Housing Act (FHA), specifically, 42 U.S.C. §§ 3604(a), (b), (c), and (d); and 42 U.S.C. § 3614(a).

In relevant part, 42 U.S.C. § 3604 makes it unlawful to,

> (a) . . . make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

> (b) . . . discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, . . .
> (c) . . . make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.
> (d) . . . represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

42 U.S.C. § 3614(a), meanwhile, permits the Attorney General to intervene where the conduct at issue constitutes a "pattern or practice" of discrimination and a "denial of rights" to a group of persons that raises an issue of general public importance. And finally, the plaintiffs move for summary judgment on the discrete point that the Mauldings are vicariously liable for the actions of Roe.

## II. Legal Standards

### A. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking to avoid summary judgment must identify admissible evidence in the record showing a fact dispute. *Id.* at 56(c)(1). "Once a summary judgment motion is made and properly supported, the nonmovant must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. Neither 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the nonmovant's burden." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (quotation marks and citations omitted).

The Court views the evidence and draws reasonable inferences in the light most favorable to the nonmovant. *Maddox v. Townsend and Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011). But the Court will not, "in the absence of any proof, assume that the nonmoving party could or would

prove the necessary facts." *McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of reh'g*, 70 F.3d 26 (5th Cir. 1995).

**B. The Fair Housing Act**

Once Title VIII of the Civil Rights Act of 1968, the FHA prohibits discrimination in housing on the basis of race, color, religion, sex (including gender identity and sexual orientation), familial status, and national origin. It declares that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C.A. § 3601. The goal of the FHA is to promote "open, integrated residential housing patterns and to prevent the increase of segregation, in ghettoes, of racial groups whose lack of opportunities the Act was designed to combat." *Otero v. New York City Hous. Authority*, 484 F.2d 1122, 1134 (2d Cir. 1973). The statute "is to be accorded a broad construction in accordance with the foregoing purpose." *United States v. Real Estate Dev. Corp.*, 347 F.Supp. 776, 781 (N.D. Miss. 1972). It prohibits all forms of discrimination, "sophisticated as well as simple-minded modes of discrimination." *Id*. at 782. The Fair Housing Amendments Act of 1988 amended the FHA to bar housing discrimination based on disability as well.

The Supreme Court has held that actions brought for housing discrimination, in effect, are actions in tort. *See Meyer v. Holley*, 537 U.S. 280, 285 (2003). "[T]he duty of a property owner not to discriminate in the leasing or sale of that property is non-delegable." *Walker v. Crigler*, 976 F.2d 900, 904 (4th Cir. 1992). And in accordance with general principles of tort law, "it is well established that the [FHA] provides for vicarious liability." *Meyer*, 537 U.S. at 285.

"[T]raditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Id.* The test is whether the principal has "the right to direct or control" the agent and whether there is "the

manifestation of consent by one person to another that the other shall act on his behalf" as well as "consent by the other to so act." *Id.* at 286 (emphasis in original) (quoting Restatement (Second) of Agency § 1).

**III. Discussion**

As an initial matter, the Mauldings' response in opposition to summary judgment fails to address the United States and plaintiff-intervenors' legal arguments and the uncontradicted evidence in the record. And there is no genuine issue of material fact as to whether Roe violated 42 U.S.C. §§ 3604(a), (b), (c), and (d), or that his conduct constituted a "pattern or practice" of discrimination and a "denial of rights" to a group of persons that raises an issue of general public importance, *see* 42 U.S.C. § 3614(a). Sitting on your hands and remaining mute in the face of a properly filed motion for summary judgment is not the answer. Thus, the Court finds that the motion for summary judgment as to those claims is granted, and turns to the only question before it: whether the Mauldings are vicariously liable for the actions of Roe.[2]

The Mauldings' only defense distils down to this: Roe discriminated, not them. *See, e.g.*, Docket No. 121 at 13 ("These alleged discriminatory acts were the acts of Roe and Roe alone."); *id.* at 14 ("Any and all conduct that may have been discriminatory were by Roe."). But for their defense to hold water, the Mauldings must identify specific facts in the record showing that Roe was not their employee or agent, or alternatively, if he was their employee or agent, that he was not acting within his scope of employment or authority.

When this Court first considered this issue, it noted that "there are a number of admissions that suggests that Roe was indeed the[] [Mauldings'] agent," Docket No. 95 at 7, and that "the

[2] But for one additional sentence, the Mauldings have copied and pasted their earlier argument that the claims are time-barred into the present memorandum in opposition to summary judgment. *Compare* Docket No. 74 at 9-10, with Docket No. 121 at 9-10. This Court has already considered and rejected that argument. Docket No. 95 at 4-5.

government cites to several occasions where the Mauldings did direct Roe's behavior" *id.* at 8, and that there was "ample evidence that casts doubt on the Mauldings' characterization of their relationship with Roe," *id.*

After the benefit of that Order, though, the Mauldings' support for their defense still amounts to mere "conclusory allegations" and "unsubstantiated assertions." *Wallace*, 80 F.3d at 1047. Where the Mauldings cite to evidence, it is merely self-serving responses to interrogatories, deposition testimony, affidavits, or letters written from them to HUD. Their evidence falls far short of what Rule 56 requires. Moreover, they fail to contradict the movants' recently-filed documentary evidence.

One example is illustrative.

Before three hearings at the Rankin County Justice Court, for which the Court has been provided transcripts and an affidavit from Judge John Shirley, presiding, Roe and Stephen Maulding represented to that court that Roe was the property manager and a co-owner of SSM Properties.

On March 25, 2013, Roe appeared in Rankin County Justice Court to represent SSM Properties. Judge Shirley, noting that Roe was not an attorney, turned Roe away for attempting to practice law without a license. On June 24, 2015, Roe appeared before Judge Shirley again. Judge Shirley attempted to turn Roe away, but Roe protested, stating,

> *I am the property manager* like any other property manager in Rankin County. I came up here to represent the properties that I'm at. My name is on the suit. Shows I'm the care of those properties. *I'm responsible for them. I handle the rentals, the removals, and everything else, just like any other property manager*.

Docket No. 112-2 at 3 (emphasis added).

Judge Shirley explained that only an attorney or the Mauldings, as owners, could represent SSM Properties, and that the Mauldings had 45 minutes to appear before the case was dismissed.

*Id.* at 4-5. Stephen Maulding appeared that same day. He informed Judge Shirley that the Mauldings "filed an agreement with the court back three years ago . . . . It gives Mr. Roe authority and one percent ownership in our property." Docket No. 112-3 at 3. As a partial owner, Maulding argued to Judge Shirley that Roe could represent the company in the eviction proceedings. "I thought we were clear on it three years ago," Maulding emphasized. Thus, Roe was permitted to represent SSM Properties in eviction proceedings.

The Mauldings have not attempted to refute their representations to Judge Shirley in open court. They have completely ignored Judge Shirley's affidavit, which was filed in response to their motion for summary judgment, and the transcripts, which were filed more recently. Maybe they have done so because of the deafening sound of their own words.

Nor do the Mauldings acknowledge a call transcript with one tester wherein Stephen Maulding explains that his "manager," Roe, was out sick. Docket No. 112-24 at 4-5; *see also* Docket No. at 113 at 11. Stephen Maulding's representations to testers, as well as judicial officials, affirmatively answers whether Roe was the Mauldings' agent and employee and show that Roe had *at least* apparent authority.

It is undisputed that the Mauldings provided Roe with the master key to their properties, gave him office space at SSM Properties, allowed him to hand out rental applications, and permitted him to show prospective renters properties. The record is replete with evidence that Roe was the Mauldings' agent and employee, and that his conduct was within the scope of his authority and employment.

To all this, the Mauldings say they first learned of Roe's conduct when they received correspondence from HUD in October 2018, three years after standing before Judge Shirley. Docket No. 121 at 5-6. They further press that Roe was not salaried; given "very limited

maintenance tasks" and "minimal payment"; and that some of Roe's actions were "unauthorized," such as answering telephone calls from prospective tenants on the business line and evaluating prospective tenants' "qualifications." *Id.* at 12.

If a principal-agent relationship is established, "[t]he principal is liable for the acts and negligence of the agent in the course of his employment, although he did not authorize or did not know of the acts complained of[.]" *Meyer*, 537 U.S. at 286; *see also Marr v. Rife*, 503 F.2d 735, 741 (6th Cir. 1974) ("The discriminatory conduct of an apartment manager or rental agent is, as a general rule, attributable to the owner and property manager of the apartment complex, both under the doctrine of *respondeat superior* and because the duty to obey the law is non-delegable."); *see also* 24 C.F.R. § 100.7(b) ("A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law.").

The documentary evidence belies the Mauldings' misrepresentations of Roe's authority and employment duties and therefore, is insufficient to create an issue of fact. They have embraced and vouched for Roe's actions for years. They cannot stand before another Court and declare their oneness and then attempt to part ways before this Court. Accordingly, there is no need for a jury to consider "Roe's contention that he did a lot of stuff behind the Mauldings' backs" and "was merely joking with prospective tenants[,]" "'trying to be a big shot.'" Docket No. 74 at 5 (quoting Docket No. 73-10, Affidavit from James Roe to HUD). The defendants' summary judgment evidence has failed to create a triable issue of fact. The jury may instead consider damages.

## IV. Conclusion

Put simply, "Choosing where you live is a right. Housing discrimination is wrong." HUD and National Fair Housing Alliance, Public Service Announcement, https://www.hud.gov/

sites/documents/nfha_hud_en_choose_2.pdf.

The evidence in this case demonstrates that these defendants engaged in housing discrimination. Nothing sophisticated about it. It was "simple-minded" discrimination. Their conduct was illegal. Their conduct was harmful.

More than 50 years after the Fair Housing Act was enacted, it is clear that HUD's work is not done. The Department of Justice's work is not done. Someday, hopefully, their work will be done, but that day is not today as the evidence in this case demonstrates.

The motions for summary judgment are GRANTED.

Within 14 days, plaintiffs shall move for default judgment or voluntarily dismiss defendant James Roe.

**SO ORDERED**, this the 3rd day of August, 2022.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE