# Exhibit A

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 0174 | **DATE** | 2/27/2007 |
| **CASE TITLE** | Jackson vs. Maram | | |

**DOCKET ENTRY TEXT**

For the reasons stated below, the Court respectfully rejects the objection of the Illinois Health Care Association to the Consent Decree in the case. The Court also grants final approval to the parties' Consent Decree.

*Mark Filip*

■[ For further details see text below.]   Docketing to mail notices.

## STATEMENT

I.   Procedural History and Background

This case is before the Court for review of a proposed consent decree (also "Consent Decree") between Defendant, Mr. Barry Maram, who is sued in his official capacity as the Director of the Illinois Department of Healthcare and Family Services, and a Plaintiff class of individuals who claim that they are not receiving medically necessary motorized wheelchairs to which they are entitled under the provisions of, *inter alia*, the Social Security Act, 42 U.S.C. §§ 1396-1396v, the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794. (D.E. 35 at 1-2.) Early on in the case, the Court granted the Plaintiffs' class certification motion and certified a class under Fed. R. Civ. P. 23(b)(2). *See id.* at 24 (certifying a class defined as "all persons with disabilities who are or will be recipients of Illinois' Medicaid program, who reside in Medicaid-funded nursing homes and for whom motorized wheelchairs are medically necessary, but who have not been provided such equipment.").

After a Rule 23(b)(2) class was certified, the parties engaged in an extensive series of settlement negotiations that led to the present Consent Decree proposal. As discussed further elsewhere, the negotiations proceeded in a decidedly arms-length fashion. The dialogue was professional, but as Mr. Stephen Gold, one of the lead attorneys for the Plaintiff class, stated at a recent hearing, the negotiations were difficult and contentious. *See* Transcript of Hearing of 01/08/07 at 6. The negotiations prompted significant compromises by both sides. *See id.*

On January 8, 2007, the Court held a final hearing concerning the proposed Consent Decree. The class members appear to overwhelming support the proposed settlement. In this regard, various individuals who may potentially receive motorized wheelchairs under the Consent Decree came to Court to manifest their support.

The Illinois Health Care Association (also "IHCA") filed an objection to the proposed Consent

| STATEMENT |
|---|

Decree. (D.E. 73.) IHCA did not move to intervene. (*Id.*)

For the reasons stated below, the objection of the IHCA is respectfully overruled. In addition, as explained below, the Court finds that the terms of the Consent Decree are fair, reasonable, and adequate. As a result, the Court grants final approval to the Parties' settlement of their dispute.

II.     Jurisdiction

The instant litigation is grounded on the Court's federal question jurisdiction. The Plaintiffs' claims are founded on causes of action granted by a variety of federal disability-rights statutes and the federal Social Security Act. This Court has subject matter jurisdiction to hear such claims. *See* 28 U.S.C. § 1331.

III.    The IHCA's Objection Is Respectfully Overruled

The Illinois Health Care Association has objected to the Consent Decree and suggested that certain portions of the Consent Decree should be modified. In summary, the IHCA suggests that Defendant seems to claim certain regulatory and/or administrative enforcement authority as against nursing homes that he may not actually have under Illinois law; that the *per diem* reimbursement rate under Illinois law is unreasonably low, such that nursing homes either should receive a higher *per diem* rate from the State of Illinois or otherwise be compensated for any motorized wheelchairs and/or testing services they may be called upon to provide; and/or that expenses for motorized wheelchairs and testing services are not contemplated to be paid from the States' *per diem* payment to Illinois nursing homes under the Illinois Medicaid regime in the first instance. (See D.E. 75.) Both the Plaintiff class and Defendant Maram contend that the IHCA's objection is substantively meritless and, as a threshold matter, that the IHCA lacks standing to object to the Consent Decree.

IHCA's objection is respectfully overruled. First, as both Plaintiffs and Defendant correctly contend, the IHCA lacks standing under Fed. R. Civ. P. 23(e) to object to the Parties' proposed settlement. *See* Fed. R. Civ. P. 23(e)(4)(A) ("Any class member may object to a proposed settlement . . . or compromise that requires court approval under Rule 23(e)(1)(A)"); *accord*, *e.g.*, *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992) ("The general rule, of course, is that a non-settling party does not have standing to object to a settlement between other parties."); *Gould v. Alleco Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals.") (collecting authorities); *Carnegie v. Household Int'l, Inc.*, 445 F. Supp. 2d 1032, 1035 (N.D. Ill. 2006) (Bucklo, J.) ("Mr. Williams is not a member of the certified class . . . . He is therefore without standing to contest the [class] settlement") (citing *Gould*, *supra*).

The reason that Rule 23(e) can limit objections to class members—*i.e.*, to parties—is because of the general rule that "a judgment or decree among parties to a lawsuit does not bind a third party who has not been made a party to the litigation." *United States v. City of Chicago*, 978 F.2d 325, 330 (7th Cir. 1992) ("Consequently, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement.") (collecting cases; citations and internal quotation marks omitted). This principle has been foundational in Anglo-American law for centuries; thus, the Supreme Court, speaking through Justice Stone, taught: "It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940); *accord*, *e.g.*, *Fogel v. Zell*, 221 F.3d 955, 964 (7th Cir. 2000) ("[T]wo parties cannot agree to extinguish the claim of a third party not in privity with either of them . . . .") (collecting cases); *Citizens Electric Co. v. Bituminous Fire & Marine Ins.*

*Co.*, 68 F.3d 1016, 1022 (7th Cir. 1995) ("Consent judgments bind only the parties who gave their consent . . . for their force rests ultimately on contract rather than a determination that the law requires what the judgment provides.") (collecting cases; internal citation omitted).

This well settled principle, when combined with Rule 23(e), means that IHCA lacks standing to object to the Parties' consensual agreement resolving their dispute among themselves. This result is consistent with due process because IHCA and its members cannot be bound by the provisions of the Consent Decree between the Parties, and the IHCA and its members retain their rights and defenses concerning any issues that might relate to the Consent Decree (or any other of the myriad other issues that might relate to them and their respective relations with any of the Parties). That result is the product of application of the well-settled legal doctrine cited above; the Parties also explicitly acknowledged this fact (*i.e.*, that the Consent Decree is not binding on the IHCA or its members and does not otherwise limit or affect their respective legal rights) in open court during the hearing concerning final approval of the Consent Decree. *See* Transcript of Hearing of 01/08/07 at 12 (statement of Mr. Gold on behalf of Plaintiffs, "That is absolutely correct"); *id.* at 13-14 (similar acknowledgments of Ms. Koniescyny, on behalf of Defendant Maram, who also interjected that she believes no putative future administrative claims or suits against her client would ultimately prove meritorious in any event); *see also id.* at 15 (statement by Mr. Lynn, IHCA's own counsel, acknowledging that the IHCA and its members were not parties to the case). There is a narrow exception to this general principle—namely, that a non-settling party or non-party may have standing to object to others' settlement if the non-settling party will suffer "plain legal prejudice" from others' settlement. *See Agretti*, 982 F.2d at 246. However, caselaw makes clear that where the non-settling party or non-party retains the right to assert its own claims or defenses as appropriate in other litigation (as everyone agrees is the case here), without any preclusive effect from others' settlement, that there is no "plain legal prejudice to the non-settling party." *Id.* Similarly, precedent teaches that "[m]ere allegations of injury in fact or tactical disadvantage as a result of a settlement simply do not rise to the level of plain legal prejudice." *Id.* (citation omitted). As a result, and as everyone agrees, the legal rights and defenses of the IHCA and its members are unaffected by the Consent Decree, and IHCA therefore lacks standing to object to its terms.

The substantive objections of the IHCA—for example, concerning whether Defendant has the enforcement powers he might claim under various Illinois statutes (Transcript of Hearing of 01/08/07 at 16), or whether the State of Illinois should raise its reimbursement rates for nursing homes generally (*id.* at 18-19)—can be advanced by the IHCA and any of its members without regard to anything in the Consent Decree. Precedent dictates that result, the Parties concede as much, and even IHCA's counsel seemed to agree. *See, e.g., id.* at 19-20; *see also id.* at 22 (IHCA acknowledging that there is an "administrative hearing process both with the Illinois Department of Health Care and Family Services and the Illinois Department of Public Health . . . ." and that any federal issues concerning those proceedings can be appealed up through the United States Supreme Court via a petition for a writ of certiorari).

It may well be the case that some of the IHCA's objections—for example, concerning the enforcement authority of the State of Illinois under Illinois law—are substantively baseless, as Defendant Maram contends. It also may be the case, as IHCA argues, that it would be better for IHCA members and their nursing home patients if the *per diem* paid by the State of Illinois to IHCA members to cover payment of "durable medical equipment" were increased. That is, at bottom, a budget prioritization decision for the Illinois General Assembly and Governor of Illinois, and it is not a subject with which this Court has license to interfere via this case. The bottom line is that IHCA and its members retain any and all rights and defenses concerning their nursing home operations, and neither the Parties nor this Court purports to adjudicate those rights here. There are other fora—likely administrative fora of the State of Illinois, with subsequent review through the Illinois courts and even potentially through the United States Supreme Court—in which such putative disputes can be resolved. *Accord, e.g., In the Matter of the Application of County Collector of the*

**STATEMENT**

*County of Winnebago, Illinois*, 96 F.3d 890, 895 (7th Cir. 1996) ("It is clear that the tax objectors, who were not parties to the consent decree, are not bound by the consent decree and are entitled to their 'own day in court' to challenge actions taken under the decree. But in what forum may such disputes be litigated? [. . . .] We conclude that the tax objections should be remanded to state court.") (internal citation omitted). Other disputes—most notably, the *per diem* reimbursement rate dispute—are likely not even legal (as opposed to political or budgetary) disputes, and IHCA and its members of course are free to lobby for higher Illinois *per diem* payments as they see fit. None of those issues are purported to be, or are, adjudicated or affected by this Consent Decree.

Accordingly, the objection of IHCA is respectfully overruled. For purposes of the record, the Court notes that IHCA never moved to intervene as a party. Accordingly, and similarly, it also lacks standing to object to the approval of the Consent Decree on appeal. *See*, *e.g.*, *Felzen v. Andreas*, 134 F.3d 873, 874 (7th Cir. 1998) ("[T]he Supreme Court [has] held that a person adversely affected by the settlement of a class action may appeal from the consent decree based on that settlement only if he has intervened as a party. *See also* Fed. R. App. P. 3(c): 'A notice of appeal must specify the *party or parties* taking the appeal by naming each appellant in either the caption or the body of the notice of appeal.'") (emphases in *Felzen*).

IV.     The Terms of the Consent Decree and Settlement Are Fair, Reasonable, and Adequate

   A.     The Case Was Properly Certified As a Rule 23(b)(2) Class Action Seeking Injunctive Relief

The Court previously issued an opinion explaining why the Plaintiffs' motion for class certification under Fed. R. Civ. P. 23(b)(2) was well-taken. (*See* D.E. 35.) That opinion spanned some twenty-six pages, and, in the interests of brevity, the Court incorporates its reasoning here, as no one has appeared to question or challenge the propriety of class treatment. In short, there was no serious question that the requirements of Fed. R. Civ. P. 23(a)—*i.e.*, numerosity, commonality, typicality, and adequacy of representation—were satisfied. With respect to the adequacy analysis, the Court notes that Plaintiff's counsel are some of the most distinguished disability-rights attorneys in the country, and they—as well as the attorneys who represented the Defendant—all performed in a first-rate manner. The adequacy prong of Rule 23(a) was easily satisfied. In addition, the class was appropriately certified under Rule 23(b)(2). The suit sought injunctive and/or declaratory relief, and caselaw reflects that cases of this sort are regularly certified under Rule 23(b)(2) to address claims of Medicaid recipients who seek to enforce various asserted benefits rights. (*See*, *e.g.*, D.E. 35 at 25-26 (collecting cases).) Appropriate notice was also provided within the meaning of Rule 23. (*See*, *e.g.*, D.E. 65, Ex. B, D.E. 70.)

   B.     The Terms of the Consent Decree Are Fair, Adequate, and Reasonable

A class action settlement should be approved if the terms are a fair, adequate, and reasonable resolution of the parties' claims and defenses. *See*, *e.g.*, *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (collecting cases and stating, "[t]he district court may not deny approval of a consent decree unless it is unfair, unreasonable, or inadequate"); *see also In re: Vitamins Antitrust Class Actions, et al.*, 215 F.3d 26, 30 (D.C. Cir. 2000) (Williams, J.) (stating that, "the district court's duty is to the class members themselves; it lacks the power to conduct a free-ranging analysis as to the broader implications of the proposed settlement" with respect to the world at large). In making this assessment, the Court must consider all relevant factors, including: the parties' chances of success; the complexity, expense, and duration of the litigation if it does not settle; and the substance and amount of opposition or support for the proposed settlement. *See*, *e.g.*, *Hiram Walker & Sons*, 768 F.3d at 889 (collecting cases). A court also must ensure that the settlement is not the product of collusion. *See*, *e.g.*, *id.* at 891.

## STATEMENT

In this case, both sides faced material risk in whether they would prevail in whole, in part, or not at all. Defendants filed a non-frivolous motion to dismiss, and the Plaintiffs met that motion with a similarly strong response. Even assuming that the claims would survive Rule 12(b)(6) analysis in whole or in part, both sides also faced material risk in terms of assembling their factual records and convincing a factfinder of the validity of their positions. Equally important, the case was quite complex, and any litigated resolution promised to come only after years of litigation—likely in both the trial and appellate courts. Such delay and concomitant expense was understandably unappealing to the Plaintiff class—whose members, if entitled to the wheelchairs in question, deserve the chairs immediately. Such delay and expense also was unappealing to the Defendant and the taxpayers he represents, who ultimately bear the costs of any legal fees incurred by Defendant (and also, likely, such attorneys' fees incurred by the Plaintiff class if they were to prevail).

There is no colorable claim that the settlement is the product of collusion. The Parties' negotiations were protracted, contentious, and real. It appeared on multiple occasions that the negotiations would break down because of impasses. The negotiations were always professional and within the confines of zealous advocacy; there is no plausible basis to suggest that they were in any way collusive.

The Court further notes that the class members appear to strongly, if not perhaps even unanimously, support the proposed settlement. Every expression tendered to the Clerk of the Court pursuant to the process established in the class notice (*see* D.E. 65-3 at 2) was supportive. *See* Transcript of Hearing of 01/08/07 at 2-3. To the extent that the Court were to consider expressions of class members that were not tendered in conformity with the designated process, those expressions of sentiment (variously and informally sent to the Parties' counsel) also were overwhelmingly supportive. *See id.* These sentiments were also consistent with the views of the numerous disabled individuals who came to the final hearing in the case to show their support.

Finally, the Court notes that it finds the substantive terms of the settlement to be reasonable and fair. Even more so than is typically the case in ordinary civil litigation, both sides had substantial risk in their positions. In the face of such risk, and in the face of the prospect of an extended and costly court fight, the Parties proceeded to negotiate a common-ground solution that involved pragmatic compromises on both sides. The substantive terms of the settlement—hammered out by experienced and expert attorneys representing both sides, and of course approved by their respective clients—are reasonable, sensible, and fair ones.

The settlement embodied in the Consent Decree, and the Consent Decree itself, is accordingly approved.